IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 05–cv–02062–EWN–CBS


JOHN GENTILE, D.D.S., and
JOHN GENTILE, D.M.D., P.C., a North Dakota Professional Corporation, d/b/a
Skyview Orthodontics, P.C.,

      Plaintiffs,

v.

ORTHODONTIC CENTERS OF NORTH DAKOTA, INC., a Delaware corporation,
ORTHODONTIC CENTERS OF COLORADO, INC., a Delaware corporation, and
ORTHODONTIC CENTERS OF AMERICA, INC., a Delaware corporation,

      Defendants.

---

## ORDER AND MEMORANDUM OF DECISION

---

     This is a contracts case.  Plaintiffs John Gentile, D.D.S. ("Plaintiff Gentile") and John Gentile, D.M.D., P.C. ("Plaintiff PC") have sued Defendants Orthodontic Centers of North Dakota, Inc. ("Defendant OCN"), Orthodontic Centers of Colorado, Inc. ("Defendant OCC"), and Orthodontic Centers of America, Inc. ("Defendant OCA"), seeking, *inter alia*, a judicial declaration that a contract between the parties is illegal under Colorado law.  This matter is before the court on Plaintiffs' "Motion for Summary Judgment Declaring Defendants' Business Services Agreement Illegal," filed November 11, 2006.  Jurisdiction is premised upon diversity of citizenship, 28 U.S.C. § 1332.

## FACTS

### 1.    *Factual Background*

Defendants OCN and OCC are both wholly-owned subsidiaries of Defendant OCA, a

Delaware corporation.  (Mot. for Summ. J. Declaring Defs.' Bus. Servs. Agreement Illegal

[hereinafter "Pls.' Br."], Statement of Undisputed Material Facts [hereinafter "SOF"] ¶¶ 4–6

[filed Nov. 10, 2006]; *admitted at* Defs. Orthodontic Ctrs. of N.D., Inc., Orthodontic Ctrs. of

Colo., Inc., and Orthodontic Ctrs. of Am., Inc.'s Resp. in Opp'n to Pls.' Mot. for Partial Summ.

J. Declaring Bus. Mgmt. [sic] Agreement Illegal [hereinafter "Defs.' Resp."], Resp. to Undisputed

Material Facts [hereinafter "Resp. to SOF"] ¶¶ 4–6 [filed Feb. 20, 2007].) Defendants provide

business and administrative services to orthodontists and orthodontic practices.  (*Id.*, SOF ¶ 7;

*admitted in relevant part at* Defs.' Resp., Resp. to SOF ¶ 7.)

Plaintiff Gentile is licensed to practice dentistry by the state of Colorado and specializes in

orthodontics.  (*Id.*, SOF ¶ 1; *admitted at* Defs.' Resp., Resp. to SOF ¶ 1.)  Plaintiff Gentile is the

sole shareholder of Plaintiff PC, a professional corporation.  (*Id.*, SOF ¶ 2; *admitted at* Defs.'

Resp., Resp. to SOF ¶ 2.)  Plaintiff Gentile moved his practice from North Dakota to Colorado in

July 2002.  (*See id.*, SOF ¶¶ 8, 13 ; *admitted at* Defs.' Resp., Resp. to SOF ¶¶ 8, 13.)

In May 1997, Plaintiffs and Defendant OCN executed a business services agreement

("BSA").  (*Id.*, SOF ¶ 8; *admitted at* Defs.' Resp., Resp. to SOF ¶ 8.)  Under the BSA, Defendant

OCN is obligated to provide business and administrative support services reasonably required for

the day-to-day operation of Plaintiffs' practice, such as: (1) marketing support; (2) employment

and training of all staff, except orthodontists; (3) billing, collection, bookkeeping, and other

financial services; (4) consulting advice; (5) legal services; and (6) payment of taxes.  (*Id.*, SOF ¶ 15; *admitted at* Defs.' Resp., Resp. to SOF ¶ 15; Pls.' Br., Ex. 1, Pt. 2 [BSA, Ex. A].)

Subject to Plaintiff PC's approval, the BSA further requires Defendant OCN to: (1) "enter into a lease for the [practice's] offices . . ., and sublease the offices to [Plaintiff] PC" at the full lease price; and (2) "acquire or otherwise arrange for all of the furniture, fixtures and equipment required by [Plaintiff] PC for the operation of the [p]ractice (the 'Fixed Assets'), and lease them to [Plaintiff] PC, for a nominal monthly rental."  (*Id.*, Ex. 1 ¶ 2.4[a]–[c] [BSA].)  The BSA also provides that, notwithstanding the fact that Plaintiff PC leases its offices and assets from Defendant OCN, Plaintiff PC "shall have complete control and custody over its offices and . . . [a]ssets."  (*Id.*, Ex. 1 ¶ 2.4[d] [BSA].)

The BSA also provides that Defendants "will take possession of and endorse in the name of [Plaintiff] PC all payments from patients, insurance companies, and other third party payors, and promptly deposit such funds in the PC Account."  (*Id.*, Ex. 1 ¶ 2.6 [BSA].)  Defendant OCN has "signatory authority over the PC Account and will be responsible for making all disbursements" therefrom.  (*Id.*, Ex. 1 ¶ 2.7 [BSA].)

The BSA accords Plaintiff PC "complete control and sole responsibility for all professional aspects of the [p]ractice," including employment of orthodontists, professional supervision of all staff, and the rendition of all orthodontic services.  (*Id.*, Ex. 1 ¶ 3.1 [BSA].)  The BSA requires Plaintiff Gentile to devote full time to his orthodontic practice throughout the term of the BSA, which is forty years.  (*Id.*, Ex. 1 ¶¶ 3.3[ii], 6.1 [BSA].)

With respect to finances, the BSA provides that Plaintiff PC will pay Defendant OCN a monthly "service fee" consisting of: (1) "[d]ollar for dollar reimbursement" of the cost of running the offices; (2) a flat fee of $22.22 for each hour of operation during which patients are being treated; and (3) a performance fee equal to fifty percent of the practice's gross revenues, less the cost of running the office, the flat fee per patient hour, Plaintiff Gentile's base compensation, and fifty percent of the cost of any new fixed assets. (*Id.*, Ex. 1 ¶ 4.1 [BSA], Ex. 1, Pt. 2 [BSA, Ex. B].) The BSA states: "The parties mutually acknowledge and agree that the fees provided for in [the BSA] in no way represent a division, splitting or other allocation of fees . . . ." (*Id.*, Ex. 1 ¶ 4.2 [BSA].)

The BSA provides that Defendant OCN is not "authorized or qualified to engage in any activity that may be deemed or construed to constitute the practice of dentistry under the laws of the State of North Dakota." (*Id.*, Ex. 1 ¶ 2.2 [BSA].) The agreement further provides that Defendant OCN "intends to act and perform as an independent contractor of [Plaintiffs], and the provisions hereof are not intended to create any partnership, joint venture, agency or employment relationship between the parties." (*Id.*, Ex. 1 ¶ 8 [BSA].)

The BSA states that, absent a material default by Defendant OCN, Plaintiffs can only terminate the agreement through: (1) bankruptcy; (2) death or disability; or (3) after five years, upon finding a successor orthodontist to buy Plaintiffs out and take over the practice under the BSA, subject to Defendant OCN's approval. (*Id.*, Ex. 1 ¶¶ 6.1–6.5 [BSA].)

On February 16, 1998, Plaintiff Gentile and Defendant OCN entered into a related agreement ("Exchange Agreement"), which was conditioned upon Plaintiffs' execution of the

BSA. (*Id.*, SOF ¶ 9; *admitted at* Defs.' Resp., Resp. to SOF ¶ 9; *see* Pl.'s Br., Ex. 2 ¶ 8[b] [Exch. Agreement].)  At the time, Plaintiff Gentile was the sole shareholder of Gentile Equipment Services, Inc. ("GES"), a company that owned and provided equipment and furnishings to Plaintiff Gentile's practice.  (*Id.*, SOF ¶ 10; *admitted at* Defs.' Resp., Resp. to SOF ¶ 10.)  The Exchange Agreement caused Plaintiff Gentile to transfer ownership of GES to Defendant OCN in exchange for 51,670 shares of Defendant OCA's voting common stock, valued at $620,035.  (*Id.*)

One final relevant provision of the BSA provides that it will govern new offices developed by the parties.  (*Id.*, Ex. 1 ¶ 7.5 [BSA].)  On December 3, 2003, Plaintiffs and Defendant OCC executed an addendum to the BSA, which extended the BSA's provisions to Plaintiffs' Colorado practice.  (*Id.*, Ex. 1, Pt. 2 [Addendum to BSA].)

*2.     Procedural History*

On October 18, 2005, Plaintiffs filed a verified complaint, requesting judicial declarations that: (1) the BSA is illegal; (2) the BSA has been rescinded because Defendants committed fraud in the inducement; (3) there is no signed agreement for the Greeley, Colorado practice; and (4) even if the BSA is not wholly illegal, its non-compete clause is illegal.  (Verified Compl. and Jury Demand [filed Oct. 18, 2005].)  Plaintiffs also asserted claims against Defendants for: (1) breach of the BSA; (2) negligence; (3) negligent misrepresentation; (4) fraud; (5) violation of the Colorado Consumer Protection Act; (6) breach of fiduciary duty; (7) trespass; (8) trespass to chattels; (9) intentional interference with contact; and (10) intentional interference with

"[p]rospective [a]dvantage."[1]  (*Id.*)  On December 20, 2005, Defendants filed an answer, asserting counterclaims for: (1) breach of the BSA; and (2) misappropriation of proprietary information. (Answer and Countercls. [filed Dec. 20, 2005].)

On March 27, 2006, Defendants filed a notice of automatic stay, informing the court they had filed voluntary petitions for relief under Chapter 11 of the bankruptcy code in the United States Bankruptcy Court for the Eastern District of Louisiana.  (Notice of Automatic Stay [filed Mar. 27, 2006].)  Thus, pursuant to section 362(a) of the bankruptcy code, Defendants' Chapter 11 petitions operate to stay: "the commencement or continuation . . . of a judicial . . . proceeding against [Defendants] that was or could have been commenced before the commencement" of the bankruptcy case.  11 U.S.C. § 362(a)(1).

On August 4, 2006, Defendants moved to transfer this case to the United States District Court for the Eastern District of Louisiana.  (Mot. to Transfer to U.S. Dist. Ct. for the E.D. La. [filed Aug. 4, 2006].)  On October 25, 2006, this court denied the motion.  (Order [filed Oct. 25, 2006].)  In this court's order, it was noted that the judge presiding over the Louisiana bankruptcy case had "granted Plaintiffs . . . relief from the stay for the purpose of litigating the issue of

---

[1]Plaintiffs also brought claims against Defendant Jim McDermott, who was subsequently dismissed from the case.  (*See* Stip. of Dismissal Without Prejudice of Claims Pled Against Jim McDermott [filed May 16, 2006].)

whether the contracts which are central to this litigation are void *ab initio* under applicable state law." (*Id.*; *see* Pls.' Br., Ex. 4 at 2–3 [9/19/06 Order from Bankr. E.D. La.].)[2]

Thus, on November 10, 2006, Plaintiffs filed a motion for partial summary judgment, arguing that the BSA is illegal under Colorado law because it violates various provisions of the Colorado Dental Practice Law ("DPL"). (Pls.' Br.) On February 20, 2007, Defendants filed a response. (Defs.' Resp.) On March 7, 2007, Plaintiffs filed a reply. (Pls.' Reply to Defs. Orthodontic Ctrs. of N.D., Inc., Orthodontic Ctrs. of Colo., Inc., and Orthodontic Ctrs. of Am., Inc.'s Resp. in Opp'n to Pls.' Mot. for Partial Summ. J. Declaring Defs.' Bus. Mgmt. [sic] Agreement Illegal [filed Mar. 7, 2007] [hereinafter "Pls.' Reply"].) This matter is fully briefed.

## ANALYSIS

### *1.    Legal Standard*

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50 (1986); *Concrete Works, Inc. v. City*

---

[2]The bankruptcy court's order applied to three other cases pending in this district against Defendant OCA and various subsidiaries: (1) *Mason v. Orthodontic Cntrs. of Colo., Inc.*, 06–cv–00068–MSK–MJW; (2) *Shaver v. Orthodontic Cntrs. of Colo., Inc.*, 06–cv–00151–WYD–CBS; (3) *Weinbach v. Orthodontic Cntrs. of Colo., Inc.*, 06–cv–00256–REB–MEH. (Pls.' Br., Ex. 4 at 3 [9/19/06 Order from Bankr. E.D. La.].) The *Mason* case was recently resolved against Defendant OCA and its subsidiaries. *See* 2007 WL 2712990 (D. Colo. Sept. 14, 2007).

*& County of Denver*, 36 F.3d 1513, 1517 (10th Cir. 1994).  The moving party bears the initial

burden of showing an absence of evidence to support the nonmoving party's case.  *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 325 (1986).  "Once the moving party meets this burden, the burden

shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter."

*Concrete Works*, 36 F.3d at 1518 (citing *Celotex*, 477 U.S. at 325).  The nonmoving party may

not rest solely on the allegations in the pleadings, but must instead designate "specific facts

showing that there is a genuine issue for trial."  *Celotex*, 477 U.S. at 324; *see* Fed. R. Civ. P.

56(e).  A fact in dispute is "material" if it might affect the outcome of the suit under the governing

law; the dispute is "genuine" if the evidence is such that it might lead a reasonable jury to return a

verdict for the nonmoving party.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997) (citing

*Anderson*, 477 U.S. at 248).  The court may consider only admissible evidence when ruling on a

summary judgment motion.  *See World of Sleep, Inc. v. La-Z-Boy Chair Co.*, 756 F.2d 1467,

1474 (10th Cir. 1985).  The factual record and reasonable inferences therefrom are viewed in the

light most favorable to the party opposing summary judgment.  *Byers v. City of Albuquerque*, 150

F.3d 1271, 1274 (10th Cir. 1998) (citing *Concrete Works*, 36 F.3d at 1517).

## 2.      *Evaluation of Claims*

### a.       *Practice of Dentistry*

Plaintiffs contend that the BSA makes Defendants "proprietor[s] of a place" where

dentistry is practiced, in violation of the DPL.  (Pls.' Br. at 23–24.)  In response, Defendants take

a broad view of the DPL and assert that finding they are "proprietors" would lead to various

absurd results.  (Defs.' Resp. at 12–15.)  Defendants further contend that Colorado's Provider

Network Statute ("PNS"), enacted to permit "new forms of collaborative systems" for the

delivery of health care, expressly sanctions relationships such as the one created by the BSA.  (*Id.*

at 11–12.)  Neither of Defendants' arguments has any merit.

> **i.**     ***Are Defendants "Proprietors" of a Place of Dentistry?***

Defendant OCA's Form 10–K states: "The laws of many states . . . prohibit non-

orthodontic entities (such as [Defendant OCA]) from practicing dentistry, including orthodontics

(which in certain states includes managing or operating an orthodontic office) . . . ."  (Pls.' Br.,

Ex. 11 at 13 [Form 10–K].)  Colorado is one such a state.

The DPL provides that "[i]t is unlawful for any person to practice dentistry or dental

hygiene in this state except those . . . [w]ho are duly licensed as dentists or dental hygienists

pursuant to this article."  Colo. Rev. Stat. § 12–35–112(a)(1).  "A person shall be deemed to be

practicing dentistry if such person . . . [i]s a proprietor of a place where dental operation, oral

surgery, or dental diagnostic or therapeutic services are performed . . . ."  *Id.* § 12–35–113(1)(b).

"Proprietor" includes any person who:

> (b)     Places in possession of a dentist . . . such dental material or equipment as
> may be necessary for the management of a dental office on the basis of a
> lease or any other agreement for compensation for the use of such material,
> equipment, or offices; or
>
> (c)     Retains the ownership or control of dental equipment or material or a
> dental office and makes the same available in any manner for use by
> dentists . . . .

*Id.* § 12–35–103(14).  "Any person who practices or . . . attempts to practice

dentistry . . . without an active license issued under this article commits" a misdemeanor on the

first offense and a felony on any subsequent offense.  *Id.* § 12–35–135; *see also id.* § 12–35–102

(stating the legislature's intent that all provisions of DPL be accorded liberal construction).

Plaintiffs contend that Defendants fall under both subsections (b) and (c) of the DPL's

definition of a "proprietor" of a dental office.  (Pls.' Br. at 23–24.)  The court has found no

legislative history, case law, or attorney general opinions construing the relevant provisions of the

DPL.  Thus, the court is tasked with statutory construction.  In construing a statute, a court's

primary purpose is to ascertain and give effect to the intent of the legislature.  *Vigil v. Franklin*,

103 P.3d 322, 327 (Colo. 2004).  The court looks first to the language of the statute itself, giving

its words and phrases their plain and ordinary meaning.  *Id.*  The court is to consider the statutory

scheme as a whole and give consistent, harmonious, and sensible effect to each individual section.

*In re Regan*, 151 P.3d 1281, 1284 (Colo. 2007).  When the statute is clear and unambiguous on

its face, the court need not look beyond its plain language.  *Frazier v. People*, 90 P.3d 807, 810

(Colo. 2004).

As stated above, the BSA requires Defendant OCN to "acquire or otherwise arrange for

all of the furniture, fixtures and equipment required by [Plaintiff] PC for the operation of the

[p]ractice (the 'Fixed Assets'), and lease them to [Plaintiff] PC, for a nominal monthly rental."

(Pls.' Br., Ex. 1 ¶ 2.4[a]–[c] [BSA].)  Exhibit D to the BSA is the executed "Fixed Asset Lease."

(*Id.*, Ex. 1, Pt. 2 [BSA, Ex. D].)  Schedule One to the "Fixed Asset Lease" includes the following

three categories of equipment, each leased to Plaintiff PC at the nominal rate of one dollar per

month: (1) "[o]rthodontic equipment;" (2) "[o]rthodontic chairs;" and (3) an "[x]-ray unit."  (*Id.*)

Thus, the court finds that Defendants indisputably place in Plaintiffs' "possession . . . such

dental . . . equipment as may be necessary for the management of a dental office" — *i.e.*,

orthodontic equipment, orthodontic chairs, and an x-ray unit.  *See* Colo. Rev. Stat. §

12–35–103(14)(b).  Further, such dental equipment is indisputably placed in Plaintiff's possession

"on the basis of a lease or any other agreement for compensation" — *i.e.*, the Fixed Asset Lease.[3]

*See id.*  Accordingly, based on the clear terms of the BSA, I find Defendants are "proprietors"

within the meaning of subsection (b).

The same terms of the BSA also reveal that Defendants are "proprietors" under section

103(14)(c), which defines "proprietor" as one who "retains ownership or control of dental

equipment or material or a dental office and makes the same available . . . for use by dentists."  *Id.*

§ 12–35–103(14)(c).  While the BSA does not purport to give Defendants "control" over the

relevant dental equipment or materials, (*see* Pls.' Br., Ex. 1 ¶ 2.4[d] [BSA] [giving Plaintiff PC

"complete custody and control" over the practice's "Fixed Assets"]), Defendants do retain

"ownership" thereof.  In the BSA, Defendants promise to "acquire" dental equipment for

Plaintiffs' practice.  (*Id.*, Ex. 1 ¶ 2.4[a]–[c] [BSA], Ex. 1, Pt. 2 [BSA, Ex. D].)  Defendants

"acquired" such dental equipment through the Exchange Agreement, whereby they purchased

GES (the holding company that had owned the dental equipment necessary for Plaintiff Gentile's

---

[3]Although Defendants do not argue as much, one might wonder whether the nominal rate at which the orthodontic equipment is leased to Plaintiff PC might render the lease agreement as something less than one "for compensation."  *See* Colo. Rev. Stat. § 12–35–103(14)(b).  A look to the broader structure of the BSA reveals that it is not.  The BSA binds Plaintiffs to Defendants for a term of no less than forty years, during which Defendants are entitled to fifty percent of Plaintiffs' net profits.  (Pls.' Br., Ex. 1 ¶¶ 4.1, 6.1 [BSA], Ex. 1, Pt. 2 [BSA, Ex. B].)  Thus, the BSA is an "agreement for compensation."  *See* Colo. Rev. Stat. § 12–35–103(14)(b).

practice) from Plaintiff Gentile.  (*Id.*, Ex. 2 at 1 [Exchange Agreement].)  In turn, the Fixed Asset

Lease made the very same dental equipment and materials "available . . . for use" by Plaintiff

Gentile.  (*Id.*, Ex. 1, Pt. 2 [BSA, Ex. D].)  Accordingly, based on the clear terms of the BSA, I

find Defendants are also "proprietors" under subsection (c).

Defendants make two weak arguments generally counseling against the conclusion that

they are "proprietors."  First, Defendants argue that if section 103(14)(b) applies to them, then "it

would be unlawful to supply dentists with dental material or equipment; apparently dentists would

have to make their own supplies and equipment."  (Defs.' Resp. at 14.)  Defendants overreach.

Section 103(14)(b) merely defines "proprietor" to include persons who *lease* to a dentist "dental

material or equipment" necessary to run a dental office.  Colo. Rev. Stat. § 12–35–103(14)(b).

As section 103(14)(c) makes clear, it is perfectly acceptable for a dentist to *purchase* such dental

items, even if said purchase is subject to a security agreement.  *See id.* § 12–35–103(14)(c)

(stating "nothing in this paragraph [c] shall apply to . . . material secured by a chattel mortgage or

retain-title agreement").  Contrary to Defendants' argument, then, section 103(14)(b) does not

require Colorado dentists to moonlight as manufacturers of dental equipment.

Defendants similarly argue that if section 103(14)(c) applies to them, then "[i]t would also

prevent anyone from leasing office space to a dentist, so that dentists must always own the

building in which they practice."  (Defs.' Resp. at 14.)  Defendants are wrong again.  Section

103(14)(c) merely defines "proprietor" to include a person who retains ownership or control of

"dental equipment or material or a *dental office* and makes the same available . . . for use by

dentists . . . ."  Colo. Rev. Stat. § 12–35–103(14)(c) (emphases added).  Giving the words and

phrases of this subsection their plain and ordinary meaning, the statute unambiguously indicates

that office space does not become a "dental office" merely by virtue of the fact that a dentist

leases it to practice his profession therein.  A "dental office," then, is an office that comes

outfitted with the "dental material or equipment" required to practice dentistry.  *See id.*  Thus,

one who leases mere office space to a dentist is not a "proprietor of a place of dentistry."

As noted above, "[a] person shall be deemed to be practicing dentistry if such

person . . . [i]s a *proprietor* of a place where dental operation, oral surgery, or dental diagnostic

or therapeutic services are performed . . . ."  *Id.* § 12–35–113(1)(b) (emphasis added).  In a

transparently desperate attempt to evade this section's obvious applicability, Defendants contend

section 113(1)(b) "does not provide that every 'proprietor' is automatically practicing dentistry."

(Defs.' Resp. at 13 [emphasis in original].)  Defendants proceed to torture the language of the

statute: "What section 113[(1)(b)] actually forbids is being 'the proprietor of a place' where

dental equipment and material is placed in the hands of dentists for dental treatment.  The []DPL

does not define 'place' . . . ."  (*Id.* at 14 [emphasis in original].)  Defendants then contend the

term's meaning "can reasonably be understood in light of *State Board of Dental Examiners v.*

*Miller*, 8 P.2d 699 (Colo. 1932)," a case in which the Colorado Supreme Court sought to

"prevent[] dentists from being shoehorned into a particular 'management' system."  (*Id.*)  In

contrast to the agreement in *Miller*, argue Defendants, the BSA does not impinge upon Plaintiffs'

professional judgment.  (*Id.* at 14–15.)

This court fails to see what bearing the question of the impingement of professional

judgment in *Miller* might have on the narrow question whether Defendants are "proprietors of a

place" of dentistry.  The court need not turn to a seventy-five-year-old case to "shed light" on the

unambiguous terms of the DPL.[4]  Reading the term "place" in context and according the statute's

terms their plain and ordinary meaning, it is clear that the term refers to the location of a dental

practice — *i.e.*, a dentist's office.  Defendants are unquestionably "proprietors" of a dentist's

office: Defendants own dental equipment, which they lease to Plaintiff PC so Plaintiff Gentile may

practice orthodontics.  (*See* Pls.' Br., Ex. 1, Pt. 2 [BSA, Ex. D].)  Consequently, I find that

Defendants are "proprietor[s] of a place where dental . . . services are performed" and, thus, must

be "deemed to be practicing dentistry."  *See* Colo. Rev. Stat. § 12–35–113(1)(b).  And because

Defendants are deemed to be practicing dentistry under the BSA, but have no license to do so, I

find the BSA constitutes an unlawful arrangement.  *See id.* § 12–35–112 (making it unlawful to

practice dentistry without a license).

Although Defendants suggest otherwise, the fact that the BSA "expressly and repeatedly

provides that [Defendants] will not practice dentistry" does not alter this conclusion.  (*See* Defs.'

Resp. at 12.)  Call itself what it will, a spade is a spade.  Defendants further contend: "[P]laintiffs

---

[4]As Judge Krieger pointed out in addressing the same argument in *Mason*:
[The] [d]efendants emphasize that, unlike the company in *Miller*, they do not
prescribe or control the particular dental techniques that the [p]laintiffs perform.
Although this is a valid distinction . . ., it has no apparent bearing on the issue of
whether the [d]efendants are "practicing dentistry" as a result of being
"proprietors" of a dental office.  The statutory definition of a "proprietor" is not
susceptible to an interpretation that turns on whether the alleged proprietor
controls the nature of the dental services performed; rather, it is focused only on
the alleged proprietor's ownership of the premises and equipment used in the
dental practice.

*Mason*, 2007 WL 2712990, at *11.

do not even argue that [Defendants are] 'practicing dentistry' under seventeen of [s]ection 113's eighteen subsections."  (*Id.*)  Be that as it may, it is unlawful for Defendants to "practice dentistry" under even *one* of section 113's subsections — and I have already determined that they do.[5]  *See* Colo. Rev. Stat. § 12–35–113.

> ### ii.      *Does the PNS Apply Here?*

The Colorado General Assembly enacted the PNS in 1994.  H.B. 94–1193, 1994 Colo. Legis. Serv. 319 (West).  The PNS authorized the creation of two related sets of entities: (1) "health care coverage cooperatives," which allow employers to pool health care purchasing power; and (2) "provider networks," which facilitate the efficient delivery of health care services to cooperatives.  Kathryn B. Stoker, *H.B. 94–1193: Health Care Purchasing Reform*, 23 COLO. LAW. 2763, 2763 (1994); *see* Colo. Rev. Stat. §§ 6–18–301(1), 6–18–301.5(1)–(3), 10–16–1002(2) (describing cooperatives and provider networks).

The DPL prohibits the unlicensed practice of dentistry by corporate entities.  *Id.* §§ 12–35–112, 12–35–116(1); *see also Pediatric Neurosurgery, P.C. v. Russell*, 44 P.3d 1063, 1067 (Colo. 2002) ("The doctrine stems from a concern that corporations have distinct interests from

---

[5]Just prior to issuance of this Order, Defendants filed notice with this court that "OrthoSyntheties, as successor to [Defendants], has assigned any and all right, title and interest, if any, in the dental equipment, furniture and fixtures used in the dental offices or dental practice of [Plaintiffs] and disclaimed any further interest therein to [Plaintiffs]."  (Defs. Orthodontic Ctrs. of N.D., Inc., Orthodontic Ctrs. of Colo., Inc., and Orthodontic Ctrs. of Am., Inc.'s Notice of Assignment of Interest in Dental Equipment, Furnishings and Fixtures [filed Sept. 17, 2007].)  Assuming that this evidence is properly raised, the court fails to see how this unilateral act might bear upon the issue of the legality of the BSA.  Defendants do not endeavor to facilitate the court's understanding, instead stating only that the assignment "may be relevant."  (*Id.*)

those of doctors and that patients will receive inferior care if corporations have any control over physicians' medical judgment."), *superceded on other grounds by* H.B. 03–1012, 2003 Colo. Legis. Serv. Ch. 240 (West).  However, the PNS creates a limited exception to the DPL's prohibition of the practice of dentistry by unlicensed entities:

> Any provision of article . . . 35 . . . of title 12, C.R.S., prohibiting the practice of any licensed . . . health care profession as *the partner, agent, or employee of or in joint venture with* a person who does not hold a license . . . to practice such profession within this state shall not apply to professional practice if a professional is participating in a provider network organized pursuant to this part . . . and [certain other conditions are met].

Colo. Rev. Stat. § 6–18–303(2) (emphasis added).

Defendants' argument that the PNS applies here fails on at least two grounds.  First, contrary to Defendants' assertions, the BSA expressly disavows any intent "to create any partnership, joint venture, agency or employment relationship between the parties."  (Pls.' Br., Ex. 1 ¶ 8 [BSA].)  Thus, it is absurd to suggest that a statute endorsing partnership, agency, employment, and joint venture relationships between health care professionals and unlicensed persons applies here.  *See* Colo. Rev. Stat. § 6–18–303(2).

Second, because the BSA was created under the laws of North Dakota rather than Colorado, (Pls.' Br., Ex. 1 ¶ 9.6 [BSA]), it can hardly be said that the arrangement between the parties constitutes a "provider network *organized pursuant to* the [PNS]," Colo. Rev. Stat. § 6–18–303(2) (emphasis added).  Had the BSA been "organized pursuant to the [PNS]," it most certainly would not contain language disclaiming any intent to enter into an agency, employment,

or joint venture relationship with Plaintiffs.  Based on the foregoing, I find the PNS is

inapplicable.

### b.      Fee Sharing

Plaintiffs argue the DPL prohibits profit-sharing arrangements that, in effect, give a

corporation an ongoing financial interest in a dental practice's revenues.  (Pls.' Br. at 21–22.)

Thus, Plaintiffs contend that the BSA constitutes an illegal fee-sharing arrangement.  (*Id.* at

18–23.)  In response, Defendants first argue that the DPL's fee-sharing prohibition is a

professional rule applicable to dentists and that it would be unjust to "reward unprofessional

conduct" by allowing Plaintiffs to void the BSA.  (Defs.' Resp. at 15–17.)  Second, Defendants

argue that because the DPL only prohibits the sharing of referral fees — a practice that the BSA

expressly disclaims — the agreement does not run afoul of the statute.  (*Id.* at 17–18.)  For the

sake of clarity, I consider Defendants' arguments in reverse order.

### i.      Does the BSA Violate the Fee-Sharing Prohibition?

The DPL creates the State Board of Dental Examiners, which may discipline a dentist for,

*inter alia*, "sharing any professional fees with anyone except those with whom the dentist . . . is

lawfully associated in the practice of dentistry," except that a dentist may pay independent

advertising agents for marketing services.  Colo. Rev. Stat. § 12–35–129(1)(v).

Defendants contend that the BSA does not violate section 129(1)(v) because: (1) the

legislative history of the statute suggests that it was merely intended to prohibit the sharing of

referral fees; and (2) Defendants "fit within th[e] exception" for entities that provide marketing

services to dentists.  (Defs.' Resp. at 17–18.)   Neither argument is even marginally availing.

*Webster's* defines: (1) "share" as "to divide and distribute in portions;" and (2) "fee" as "compensation often in the form of a fixed charge for a professional service." *Webster's Third New International Dictionary of the English Language* 833, 2087 (Philip Babcock Gove ed. 1986); *see* 2A Norman J. Singer, *Sutherland on Statutory Construction* § 47.27 (6th ed. 2000) (stating dictionaries are an appropriate guide to interpreting undefined statutory terms). Thus, it would seem that, by enacting section 129(1)(v), the Colorado General Assembly broadly sought to deter dentists from dividing their professional compensation with those not lawfully associated in the practice of dentistry. *See* Colo. Rev. Stat. § 12–35–129(1)(v). Nothing in the statute suggests that the sharing of fees ought to be limited only to referral fees. *See id.*; *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("When the words of a statute are unambiguous, then, th[e] first canon is also the last: judicial inquiry is complete.").

Although unnecessary, a broader inquiry only confirms this conclusion. If the Colorado General Assembly had intended to bar only referral fees, it would have written the statute to reflect such intent — for it has specifically done so in numerous other instances. *See, e.g.*, Colo. Rev. Stat. § 12–33–117 (barring remuneration for the referral of chiropractic clients); *id.* § 12–36–125(1)(a) (same for medical doctors); *id.* § 12–40–118(1)(l) (optometrists); *id.* § 12–41–115(1)(j) (physical therapists); *id.* § 12–43–222(1)(q) (mental health professionals). The use of different language in similar statutes reflects a conscious legislative decision, which this court must heed. *See Doe v. DiGenova*, 779 F.2d 74, 83 n.19. (D.C. Cir. 1985) ("'On the basis of analogy the interpretation of a doubtful statute may be influenced by language of other statutes which are not specifically related, but which apply to similar persons, things, or relationships.'"

-18-

[quoting 2A N. Singer, *Sutherland Statutory Construction* § 53.03, at 554 (Sands 4th ed. 1984)]);
*see also Allstate Ins. Co. v. Avis Rent-A-Car Sys.*, 947 P.2d 341, 345–46 (Colo. 1997).

Moreover, as Plaintiffs point out, the development of the statute over time refutes
Defendants' position.  (*See* Pls.' Reply at 5–9.)  As of 1921, the statutes governing the practice of
dentistry did not speak to fee sharing.  *See* Colo. Laws § 4571–79 (1921).  By 1935, the law
barred "[s]haring professional fees with anyone *or* paying any person for sending or referring
patients."  *See* Colo. Stat. Ch. 52 § 12(11) (1935) (emphasis added).  By 1961, the redundancy of
the prior version had been eliminated, and the statute broadly barred a dentist from "[s]haring any
professional fees with anyone except those with whom he is lawfully associated in the practice of
dentistry."[6]  Colo. Sess. Laws. Ch. 111 § 19(2)(p) (1961).  Other than a gender-neutralizing
amendment and the addition of the exception for agents providing marketing services, the statute
remains the same to this day.  *See* Colo. Rev. Stat. § 12–35–129(1)(v) (2007).  Based on the
foregoing, I find that section 129(1)(v)'s fee-sharing prohibition does not exclusively bar the
payment of referral fees.

Forgetting that the exception cannot swallow the rule, Defendants suggest that because
the BSA obligates them to provide marketing services for Plaintiffs, *nothing* in the BSA can run
afoul of section 129(1)(v).  (Defs.' Resp. at 18.)  Nonsense.  The exception to the otherwise
broad fee-sharing prohibition states:

---

[6]Defendants make the mystifying contention that the 1961 revision actually reveals the
legislature's intent to bar *only* the sharing of referral fees.  (Defs.' Resp. at 17–18.)  This is
absurd.  By eliminating the more specific language, the legislature revealed its intent to bar much
more than the mere payment of referral fees.

> [I]t shall not be considered a violation of this paragraph (v) if a licensed
> dentist . . . pays to an independent advertising or marketing agent compensation
> for advertising or marketing services rendered on the licensed dentist's . . . behalf
> by such agent, including compensation that is paid for the results or performance
> of such services on a per-patient basis.

Colo. Rev. Stat. § 12–35–129(1)(v).  The BSA does not merely obligate Defendants to provide

advertising or marketing services to Plaintiffs — it also obligates them to provide, *inter alia*: (1)

consulting advice on practice efficiency and productivity; (2) payroll administration and

accounting; (3) negotiation of office leases as well as office upkeep and maintenance; (4)

acquisition, upkeep, and maintenance of fixed assets; (5) bookkeeping, accounting, billing, and

collections; (6) processing and distribution of all checks, including payroll, payables, taxes, and

rents; (7) preparation of statistical data and analyses of office operations; (8) legal services; and

(9) recruiting, employment, and training of office staff.  (Pls.' Br., Ex. 1, Pt. 2 [BSA, Ex. A].)

Defendants' contention that the BSA falls within the exception set forth in section 129(1)(v) is,

thus, strikingly unmoored from reality.  Section 129(1)(v) specifically permits only one very

narrow class of fee sharing.  *See* Colo. Rev. Stat. § 12–35–129(1)(v).  While one small aspect of

Defendants' obligations under the BSA might fit into that narrow exception, Defendants cannot

cram the myriad other aspects of the BSA into the exception like so many clowns into a

Volkswagen Beetle.

The upshot is that an agreement to share fees for anything other than "advertising or

marketing services" must constitute *impermissible* fee sharing.  *See id.*  Here, there is no question

that the parties share fees under the BSA.  As stated above, the BSA entitles Defendants to: (1)

"[d]ollar for dollar reimbursement" of the cost of running the offices; (2) a flat fee of $22.22 for

each hour of operation during which patients are being treated; and (3) fifty percent of the practice's net proceeds.  (Pls.' Br., Ex. 1 ¶ 4.1 [BSA], Ex. 1, Pt. 2 [BSA, Ex. B].)  Unlike a payment arrangement based concretely upon services rendered, the BSA's arrangement, which is tied both to the amount of time Plaintiff Gentile spends treating patients and the profits derived therefrom, constitutes the division of fees rendered for professional services.  Thus, I find that the BSA violates section 129(1)(v)'s prohibition of the sharing of fees with an unlicensed person.

In a haphazard attempt to evade this conclusion, Defendants suggest that language in the BSA asserting that the agreement "in no way represent[s] a division, splitting or other allocation of fees" ought to control the court's analysis of whether the BSA is a fee-sharing agreement. (Defs.' Resp. at 18 [citing Pls.' Br., Ex. 1 ¶ 4.2 (BSA)].)  I will not be distracted by rote language running contrary to the economic substance of the parties' bargain.

### ii.    Ramifications

Defendants argue that section 129(1)(v) does not declare "agreements to 'share' fees to be void or illegal, as distinct from merely unethical for the dentist." (*Id.* at 15.)  Defendants then assert that if the BSA causes impermissible fee sharing, it is unfair to reward Plaintiff Gentile's unethical conduct with the recision of the agreement.  (*Id.* at 16–17.)  In response, Plaintiffs assert that to enforce a contract that violates professional standards of conduct is to undermine legislative intent to protect the public from "the creation of economic incentives that could . . . compromise patient care."  (Pls.' Reply at 6.)

Defendants' arguments are creative, but raise a false choice.  Although Defendants are correct that section 129 merely lists conduct for which dentists — rather than their contractual

counterparties — may be professionally disciplined, this does not mean that a court must enforce a contract that requires conduct expressly barred by statute.  *See Potter v. Swinehart*, 184 P.2d 149, 152 (Colo. 1947) (reiterating principle that courts will not enforce illegal contracts).

Even if, as Defendants contend, the BSA "merely" mandates unprofessional — rather than squarely illegal — conduct, I find that such an agreement violates public policy.  Defendants are dead wrong when they assert that "the risk of engaging in unprofessional conduct is placed on the dentist, not on his or her contracting counterparties."  (Defs.' Resp. at 16.)  At this juncture, the risk the court is concerned with is that to the public posed by a contract to engage in unprofessional conduct.  *See* Colo Rev. Stat. § 12–35–102 (containing legislative declaration that the DPL exists to protect "the public, health, safety, and welfare"); *see also Russell*, 44 P.3d at 1067 (discussing the rationale for the ban on corporate involvement in the practice of medicine).

A contractual provision is void if the interest in enforcing it is clearly outweighed by a contrary public policy.  *FDIC v. Am. Cas. Co.*, 843 P.2d 1285, 1290 (Colo. 1992); *see Equitex, Inc. v. Ungar*, 60 P.3d 746, 750 (Colo. Ct. App. 2002) ("A court will not enforce a contract that violates public policy even if the failure to do so is 'unfair' to one of the parties."); *see also In re Marriage of Ikeler*, 161 P.3d 663, 672 (Colo. 2007) (Eid, J., concurring) (stating a contract that violates public policy is "void from the beginning, *ab initio*" [citations omitted]).  Here, there is no doubt that the public interest in, *inter alia*, preventing conflicts of interest between dentists and unlicensed entities such as Defendants heavily outweighs Defendants' expectations under the BSA.  This is particularly so where, as here, a dentist's contractual counterparty entered into the agreement with an acute awareness that it was venturing into dangerous territory: Defendant

-22-

OCA's Form 10–K states its belief that its business model does not run afoul of state dental practice statutes but underscores the potential for legal rulings to the contrary.  (*See* Pls.' Br., Ex. 11 at 12 [Form 10–K].)

Indeed, Judge Krieger recently determined that nearly identical business service agreements between subsidiaries of Defendant OCA and a number of Colorado orthodontists were contrary to public policy under a multi-factor test espoused in section 178 of the *Restatement (Second) of Contracts. Mason*, 2007 WL 2712990, at *8–10.  I find that Judge Krieger's well-reasoned section 178 analysis is fully applicable to the instant case and incorporate it here by reference.

Finally, I note that the BSA requires that Plaintiffs "comply at all times with the applicable dental professional and ethical standards."  (Pls.' Br., Ex. 1 ¶ 3.1[b] [BSA].)  Thus, the BSA simultaneously requires and forbids unethical conduct.  This is hardly the sort of bargain that merits judicial enforcement.

   **c.      Collected Ephemera**

At the end of their brief, Defendants make two further arguments that, in the interest of completeness, must be aired and dispatched.  Defendants first argue that Plaintiffs' motion must be "denied because Colorado law is not even applicable to the BSA," which states that it "shall be governed by and construed in accordance with the laws of . . . North Dakota."  (Defs.' Resp. at 21 [citing Pls.' Br., Ex. 1 ¶ 9.6 (BSA)].)  This argument is wholly disingenuous.  First, Defendants tellingly make no effort to show that the BSA is legal under North Dakota law.  (*Id.*) Second, it is undisputed that Plaintiff Gentile moved his practice from North Dakota to Colorado

and the BSA was amended to reflect this change.  (*See* Pls.' Br., Ex. 1, Pt. 2 at 21 [Addendum to

BSA].)  It is also beyond dispute that Colorado's DPL governs the conduct of both: (1) Plaintiffs,

in the practice of dentistry in the state; and (2) Defendants, by setting limits as to what they can

and cannot do in relation to Plaintiffs' Colorado practice.  *See* Colo. Rev. Stat. § 12–35–101 *et*

*seq.*  Finally, the one case Defendants cite fails to support their position.  In *American Express*

*Financial Advisors, Inc. v. Topel*, Judge Babcock noted Colorado law provides that the forum

state should apply the law chosen by the parties unless: (1) there is no reasonable basis for the

parties' choice; or (2) the application of the law chosen would be contrary to a fundamental policy

of a state that has a materially greater interest in the issue.  38 F. Supp. 2d 1233, 1238 (D. Colo.

1999).  Here, the reasonable basis for the parties' choice of North Dakota law was vitiated once

the parties agreed that Plaintiffs' practice would be relocated to Colorado.  (*See* Pls.' Br., Ex. 1,

Pt. 2 at 21 [Addendum to BSA].)  There is no question that Colorado's DPL governs a Colorado-

licensed dentist practicing in Colorado.

      Second, Defendants argue that even if this court finds the BSA is illegal, factual issues

concerning severance, reformation, and Defendants' entitlement to compensation remain.  (Defs.'

Resp. at 21.)  Defendants' arguments are beyond the scope of the issue raised by Plaintiffs'

motion for partial summary judgment: whether the BSA is unenforceable on its face.  (*See* Pls.'

Br.)  Nevertheless, the court emphasizes that the instant case is most unlike cases where an

unenforceable clause is read out of an otherwise valid contract.  *Cf. Meyer v. State Farm Mutual*

*Auto. Ins. Co.*, 689 P.2d 585, 593 (Colo. 1984), *superceded by* Colo. Rev. Stat. §

10–4–418(2)(b) (1994) (awarding insurance coverage barred by illegal policy exclusion); *Reilly v.*

*Korholz*, 320 P.2d 756, 761–62 (Colo. 1958) (enforcing stock purchase agreement notwithstanding voided clause concerning voting obligations); *Otis Elevator Co. v. Md. Cas. Co.*, 33 P.2d 974, 977–78 (Colo. 1934) (refusing to enforce clause disclaiming liability for negligence in contract for elevator repair).  In contrast, severance of the fee-sharing provisions from the BSA would, in effect, eviscerate the core bargain between Plaintiffs and Defendants.

*3.*     *Conclusion*

Based on the foregoing it is therefore ORDERED that:

1.     PLAINTIFFS' motion (#58) is GRANTED.  The final judgment entered at the conclusion of this case will include a declaration that the BSA is illegal and void as against public policy.

2.     Every thirty days from the date of this Order, the parties shall file reports with this court concerning the status of Defendants' pending bankruptcy case.

Dated this 27th day of September, 2007

BY THE COURT:


s/ Edward W. Nottingham
EDWARD W. NOTTINGHAM
Chief United States District Judge